FILED

2021 Mar-11  PM 02:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CLAUDETTE STEELE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-02139-SGC |
| | ) | |
| BIRMINGHAM JEFFERSON CIVIC | ) | |
| CENTER AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION[1]

This is an employment discrimination case.  The plaintiff, Claudette Steele, claims the defendant, the Birmingham Jefferson Civic Center Authority (the "BJCC"), discriminated against her based on her race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Fourteenth Amendment of the U.S. Constitution.  (Doc. 1).[2]  Steele asserts her Fourteenth Amendment claim through 42 U.S.C. § 1983.  (*Id.*).  This memorandum opinion addresses a motion for summary judgment filed by the BJCC.  (Doc. 38).

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Doc. 19).

[2] While Steele also asserted a sex discrimination claim in her complaint, she now concedes that claim is due to be dismissed because she has no evidence to support it.  (Doc. 44 at 23 n.19).

For the reasons discussed below, the motion is due to be granted, and this action is due to be dismissed with prejudice.

## I.  Material Facts[3]

### A.  Steele's Employment with the BJCC

The BJCC is an entertainment venue.  (Doc. 40-1 at 2).  It hired Steele, who is Black, as a housekeeper in 1980.  (Doc. 40-2 at 6).  Steele left the BJCC in 1989 to care for her children but returned in 1991 or 1992 as a cashier and ticket seller. (*Id.* at 6, 9).  After several inter-departmental transfers and promotions, the BJCC promoted Steele in 2008 to the position of Building Services Manager, reporting directly to David Smith, the BJCC's Assistant Director of Operations, who reported directly to Matt Wilson, the BJCC's Director of Operations.  (Doc. 40-2 at 9-10; Doc. 40-6 at 9-10).[4]

In her role as Building Services Manager, Steele supervised approximately 20 full-time housekeepers and groundskeepers and evaluated their performance, supervised contract laborers, purchased supplies, met with vendors, attended bid

---

[3] The following facts are undisputed, unless otherwise noted.  They are viewed in the light most favorable to Steele, as the non-movant, with Steele given the benefit of all reasonable inferences.

[4] In her response to the BJCC's motion for summary judgment, Steele states "for clarification" that her title was "Housekeeping Manager, Building Services Manager, and Custodial Services Manager."  (Doc. 44 at 2-3).  However, Steele testified during her deposition that "Housekeeping Manager, Building Services Manager, and Custodial Services Manager" "all mean the same thing."  (Doc. 40-2 at 10).  Therefore, in the interest of brevity, the court will use the term "Building Services Manager" when referring to the last position Steele held at the BJCC.

meetings, and ensured the BJCC's buildings and grounds were presentable to the public. (Doc. 40-2 at 10). Elma Bell, the BJCC's Director of Human Resources, testified Steele's performance in her role as Building Services Manager was "stellar." (Doc. 40-6 at 17). In 2011, 2012, 2013, 2014, and 2015 Bell received performance review scores of 92%, 97%, 98%, 99%, and 99%, respectively. (Doc. 45-7 at 4, 9, 14; Doc. 45-8 at 2, 7). Steele's reviewers noted she "demonstrate[d] a strong team playing ability" and "[was] [] thoughtful and considerate of other staff" and that "[t]he transformation of the entire department since she [had] taken over [] [had] been wonderful[,] from individual performance of staff to morale." (Doc. 45-7 at 15; Doc. 45-8 at 4). Steele's employment file contains no incidents of conduct requiring discipline until 2016. (Doc. 45-8 at 12).

On August 15, 2016, Tad Snider, the BJCC's Chief Executive Officer, received an anonymous e-mail from the e-mail address "pleasehelpusbjcc@gmail.com." (Doc. 40-7 at 2).[5] The e-mail states:

> Our housekeeping department is in need of help. We are facing so many problems of being mistreated, unfairness, bribery, threats, gossip, communication of employee personal information outside the department and so many other things. We have no one to turn to. It's

_____

[5] Steele argues the August 15, 2016 e-mail should be disregarded at this stage of the litigation because it was provided by Snider, who is an "interested witness" with "a motive to shape his evidence and/or testimony so that it coincides with the seemingly legitimate reasons for terminating [] Steele." (Doc. 44 at 4). The Eleventh Circuit has rejected this argument, at least to the extent the evidence provided by an "interested witness" is uncontradicted. *See Woods v. Delta Air Lines Inc.*, 595 F. App'x 874, 879-80 (11th Cir. 2014). Steele presents no evidence that calls into question the authenticity of the e-mail.

impossible to speak with David about the situation because EVERYTHING that anyone tell him he ALWAYS let Claudette know who said what. To begin our manager (Claudette) is the most evil person in the facility. It's either her way or no way, it's always a black and white thing, she don't know how to speak to the employees, if you're not buying or feeding her she's totally against you. She use the Hispanic contracts to buy things and she accepts money from them in exchange for working more hours. I spoke with an employee (Darrin Turner), he stated that Claudette made the statement to him stating that he "run to the white folks on her" and that you don't like black people and it's [a] waste of time talking to you, because if he's not the right color you don't have time for him. Working here at the BJCC is HELL. Some [people] have to work 6 and 7 days without a off day while others are off every other weekend. We have some employees that work a lot of overtime, these are the ones that buy her food and give her money. Claudette sit in the Standards Dept. and talk to Chandrel Gibson about everything that goes on with the housekeeping employees work and personal business. I'm not sure what's going on, I just know that NO ONE is happy. I have spoke with Ann on several occasions about the things that's going on, but there haven't been a change. Our department is in great need of help. The only reason we want to speak out is because we are in fear of [losing] our job or being mistreated. Even though we have had the opportunity to speak at meetings, our problem is speaking in the presence of everyone, not knowing who to trust. We beg for your help. Please help us, before the situation gets worse. Some of the employees would love to speak with you one on one. Right now we have no trust in David so we will not communicate with him about anything. If possible please [] have someone to contact our lead supervisor LaSandria White and let us know what we can do to fix this[.]

(*Id.*).[6]

---

[6] Unless otherwise indicated with punctuation, the contents of the e-mail are quoted verbatim. Grammatical and other errors appear in the original.

The BJCC retained Michael Quinn, an attorney, to investigate the allegations made in the e-mail.  (Doc. 40-6 at 9).  On November 7, 2016, Quinn and Bell met with Steele to discuss the allegations.  (Doc. 40-2 at 18-19).  At the conclusion of the meeting, Bell informed Steele she was being placed on administrative leave with pay until the conclusion of Quinn's investigation.  (Doc. 40-2 at 19; Doc. 40-6 at 10).

Over the course of the following week, Quinn interviewed more than one dozen full-time employees under Steele's supervision and at least one contract laborer.  (Docs. 45-2, 45-3, 45-4, 45-5, 45-6; 48-1 at 4-13).  While some of the individuals Quinn interviewed had positive or neutral things to say about Steele, at least half described Steele's management of them in negative terms.  The complaints made about Steele included that she talked to the employees under her supervision like children and bullied them, including by threatening to terminate them; showed favoritism to certain employees and contract laborers, for example by allowing them to sit around while others were required to pick up their slack and by giving them overtime while withholding it from others;[7] retaliated against employees for various perceived infractions by making them work consecutive weekends; purposely pitted

---

[7] The individuals interviewed by Quinn attributed the favoritism exhibited by Steele to a variety of factors, including Steele's perceived friendship with certain employees and reports that certain employees and contract laborers purchased material goods or food for Steele or gave her money. (Doc. 48-1 at 6-9).  Ultimately, Quinn was not able to corroborate employees' statements they had heard Steele accepted "gifts" in exchange for preferential treatment.  (*Id.* at 13).

the first shift against the second shift to "stir things up"; gossiped about employees' personal business; made people cry; and told Black employees they should not complain to Snider or Smith, who are White, because they did not like Black people and would not believe them.  (Doc. 48-1 at 5-10).  Multiple employees confirmed that after one employee complained about Steele to the Human Resources Department, Steele harassed the employee for three hours by repeatedly calling him to come from wherever he was working to her location on the loading docks, where she would state she could not believe he "put the white folks on [her]."  (*Id.* at 7-8, 10).  One employee reported he once saw Steele raise her radio as if she were going to hit another employee.  (*Id.* at 6).  Another employee stated that when he requested to change shifts so he could be available to support his girlfriend who had delivered a stillborn baby, Steele refused the request and told him the woman was not his wife and the baby might not have been his.  (*Id.* at 8-9).  Yet another employee reported half of the employees were thinking of leaving because of the way they were treated by Steele.  (*Id.* at 9).  Bell, who participated in the interviews with Quinn, testified some of the individuals interviewed "[sat] in from of [them] in tears, crying profusely, begging [them], pleading with [them] not to disclose what they were telling [them] because of fear of retaliation [by Steele]."  (Doc. 40-6 at 17).[8]

---

[8] Steele argues Bell's testimony regarding the emotional distress exhibited by some employees interviewed by Quinn should be disregarded for the same reason she argues the August 15, 2016 e-mail should be disregarded.  (Doc. 44 at 5-6).  Because Steele presents no evidence that casts

After completing his investigation, Quinn concluded it was obvious Steele had created a serious problem in the Building Services Department. He attributed the problem to Steele's unprofessional management style, as exemplified by her "mean and disrespectful" treatment of the employees under her supervision, exhibition of favoritism toward certain employees, gossiping about employees' personal lives, discriminatory comments about her White supervisors, and retaliatory conduct towards employees who complained about her to her superiors. He noted Steele's supervisor, Smith, was not aware of this unprofessional conduct because employees were afraid to complain to him. (Doc. 48-1 at 10).

Based on his findings, Quinn recommended the BJCC exercise one of three options: (1) remove all of Steele's supervisory responsibilities while allowing her to retain her position as Building Services Manager, (2) transfer Steele to another position, or (3) terminate Steele's employment, if neither of the first two options were feasible. (*Id.* at 11). Bell, Smith, and Wilson determined it was not feasible to strip Steele of her supervisory responsibilities while allowing her to retain her position as Building Services Manager, given employees feared retaliation from Steele. Moreover, there was not another available and appropriate position to which Steele could be transferred. Therefore, Bell, Smith, and Wilson concluded, in

---

doubt on the veracity of Bell's testimony, the argument fails here, as well. *See Woods*, 595 F. App'x at 879-80 (discussed *supra*).

keeping with Quinn's recommendation, that the BJCC should terminate Steele's employment. (Doc. 40-6 at 17). Snider agreed, and on November 18, 2016, Bell and Smith informed Steele her employment was being terminated based on Quinn's investigation. (Doc. 40-2 at 21; Doc. 40-8 at 7; Doc. 40-9 at 2). In an e-mail sent to the BJCC's payroll administrator, Bell stated Steele was terminated for inappropriate and unprofessional conduct and because she had threatened and intimidated employees. (Doc. 40-10 at 2). After Steele appealed her termination, Snider stated in a letter upholding the termination decision that the decision was based on corroborated complaints of Steele's unprofessional and disrespectful management style. (Doc. 45-7 at 2).[9] The BJCC has an employment policy which provides the type of misconduct Steele engaged in "may" subject an employee to immediate discharge without prior progressive discipline. (Doc. 40-4 at 5; Doc. 40-5 at 5).

## B.   Comparators Offered by Steele

As "comparators," a legal term addressed more fully in the discussion section below, Steele offers Susette Hunter and Renee Browning. Hunter is the BJCC's

---

[9] Steele disputes she was terminated in part for threatening and intimidating employees, citing Snider's letter upholding her termination, which does not explicitly reference threats or intimidation. (Doc. 44 at 7). The unprofessional and disrespectful management style Snider did explicitly reference reasonably encompasses the threatening and intimidating behavior revealed by Quinn's investigation and explicitly referenced in Bell's e-mail setting out the reason for Steele's termination. Steele also asserts there was a lack of consensus of poor treatment among employees interviewed by Quinn. (*Id.*). Whatever Steele means by "consensus," it is beyond dispute that among the employees interviewed by Quinn there was at least corroboration of complaints that Steele threatened and intimidated employees and otherwise treated them poorly.

Director of Sales. (Doc. 40-6 at 20). She has been employed by the BJCC since 1992. (Doc. 45-9 at 17). Browning served as a Sales and Marketing Manager for the BJCC and then as its Assistant Director of Sales. (Doc. 40-6 at 20; Doc. 45-9 at 6). She was employed by the BJCC between June 2015 and the spring or summer of 2017. (Doc. 45-9 at 6, 8, 20-26). Both women are White. (Doc. 40-6 at 20). Steele's performance review scores in the years immediately preceding her termination exceeded the most recent performance review scores for Hunter and Browning. (Doc. 45-7 at 9, 14; Doc. 45-8 at 2, 7, 19; Doc. 45-9 at 2, 10).

Bell testified Hunter and Browning "just weren't getting along" and "could not co-exist" because they "had completely different sales styles" that "were like night and day." (Doc. 40-6 at 20-21, 24, 27). She further testified that when Hunter made decisions within her responsibility to make as head of the Sales Department, but which Browning did not like, Browning would complain to Bell or Snider and claim the working environment was "hostile." (*Id.* at 21-22, 24). Bell described Browning's complaints as "constant[]." (*Id.* at 21). She believed Hunter and Browning each bore responsibility for the conflict to the extent neither party "want[ed] to yield on her end." (*Id.* at 24). After the BJCC held several meetings with Hunter and Browning that were unsuccessful in encouraging the two women to work together harmoniously, it hired Quinn to mediate the conflict in the fall of 2016. (*Id.* at 20, 24).

9

Quinn interviewed Hunter, Browning, Tara Roseberry (a Contract Specialist Administrator in the Sales Department), Anna Jones (a Marketing Coordinator for the BJCC who Hunter supervised for 17 years), Elaine Witt (a former Communications Manager who Hunter supervised for one-and-a-half years), and Kim Jackson (the Director of Sales & Marketing for a local hotel who worked with both Hunter and Browning).  (Doc. 45-1 at 2-7).  Based on these interviews, which provided additional context for the conflict between Hunter and Browning, Quinn concluded the circumstances of Browning's hiring were "the root[s] of the problem" between Hunter and Browning.[10]  Additionally, he attributed the conflict to deficiencies in Hunter's management style on the one hand and Browning's job performance on the other.  (*Id.* at 7-10).

Quinn determined Hunter had a "very aggressive, straight-forward, and at times abrasive personality" that carried over into her management style.  This determination was based on Quinn's interviews with (1) Browning, who depicted a cold reception by Hunter when she came to work in the Sales Department; (2) Witt, who reported she resigned from her position at the BJCC because it was difficult to work with Hunter, who created a "hostile" work environment, "de[f]i[ed]" Snider by vocally and publicly opposing his decisions, and "punished" Witt if she did not

---

[10] Disposition of the BJCC's motion for summary judgment does not require the undersigned to address these circumstances in greater detail.

do things Hunter's way; and (3) Jackson, who also indicated it could be difficult to work with Hunter and further described her as "rude" and "abrasive." (*Id.* at 5-7, 9).[11]

Quinn determined Browning's job performance was deficient in certain areas, including communication and availability.  This determination was based on Quinn's interviews with Hunter, Roseberry, Jones, and Jackson, who collectively reported Browning did not account for her time or report what she was doing; could not be reached, did not return phone calls, and/or was sometimes hard to find; did not pay attention to detail; had made many mistakes; had lied when confronted with those mistakes; and would not take direction from Hunter.  (*Id.* at 2-5, 7-8, 10).  The record also contains evidence Browning came to work smelling of alcohol on one or more occasions.  (Doc. 45-1 at 4; Doc. 45-9 at 13).

Finally, Quinn determined neither Hunter nor Browning should be removed from her position and, instead, recommended measures to remediate the issues underlying their conflict.  More specifically, he recommended Hunter attend management counseling to learn how to be more professional and not "abrasive, overbearing, and condescending."  He also recommended Hunter be instructed she should not behave in a manner that could be viewed as insubordination.  He

---

[11] While Steele asserts Witt stated Hunter often "threatened" her, none of Witt's statements to Quinn fairly can be characterized in that manner.  (Doc. 44 at 19).

recommended Browning be required to improve her communication skills with other employees by promptly responding to phone calls and e-mails and making her cell phone number available to employees who needed to contact her on a regular basis and that Browning's hours and communications be monitored for one or two months to ensure she was working the hours required to perform her job. Finally, he recommended Hunter and Roseberry have no direct contact with Browning unless absolutely necessary and, instead, communicate with Browning through her assistant. (*Id.* at 9-10).

The BJCC implemented Quinn's recommendations and, additionally, removed Browning from Hunter's supervision and instructed her to report directly to Snider. (Doc. 40-6 at 25-30). Browning left the employment of the BJCC in the spring or summer of 2017 pursuant an agreement between the parties that included a severance package. (Doc. 40-6 at 22; Doc. 45-9 at 8, 20-26).[12]

## II.    Standard of Review

Under Rule 56 of the *Federal Rules of Civil Procedure*, "[t]he [district] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);

---

[12] Bell testified the conflict with Hunter was "not in its entirety" the reason for the separation but, rather, the reason was "more [based] on [performance] issues." (Doc. 40-6 at 25).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The party seeking summary judgment bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the record the party believes demonstrate the absence of a genuine dispute as to a material fact.  *Celotex Corp.*, 477 U.S. at 323.  If the moving party carries its initial burden, the non-movant must go beyond the pleadings and come forward with evidence showing there is a genuine dispute as to a material fact for trial.  *Id.* at 324.

The substantive law identifies which facts are material and which are irrelevant.  *Anderson*, 477 U.S. at 248.  A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-movant.  *Id.* at 248.  If the evidence is merely colorable or not significantly probative, summary judgment is appropriate.  *Id.* at 249-50 (internal citations omitted).  All reasonable doubts about the facts should be resolved in favor of the non-movant, and all justifiable inferences should be drawn in the non-movant's favor.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## III.    Discussion

Title VII prohibits an employer from discriminating against an employee on the basis of that person's race.  42 U.S.C. §§ 2000e-2(a)(1).  A Title VII claim and a race-based discrimination claim asserted through § 1983 have the same elements where, as here, the claims are based on the same set of facts.  *Crawford v. Carroll*,

13

529 F.3d 961, 970 (11th Cir. 2008).  Therefore, the following discussion of Steele's Title VII claim applies equally to her § 1983 claim.  *See Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) (noting court "need not discuss" Title VII claim and race-based employment discrimination claim asserted through § 1983 separately).

There are three theories of discrimination under Title VII: disparate treatment discrimination, disparate impact discrimination, and pattern-and-practice discrimination.  *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1273 (11th Cir. 2000).  Steele proceeds under the first theory.

Disparate treatment claims come in two types: (1) those involving tangible employment actions, such as termination, and (2) those based on a hostile work environment that alters the terms and conditions of employment, even though the employee does not suffer a tangible employment action.  *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010).  Steele's disparate treatment claim is based on her termination and, thus, involves a tangible employment action.

A plaintiff can establish a disparate treatment claim under Title VII with direct or circumstantial evidence.  *Burke-Fowler v. Orange Cty., Florida*, 447 F.3d 1319, 1323 (11th Cir. 2006).  "Direct evidence is evidence, that, if believed, proves the existence of a fact without inference or presumption."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (internal quotation marks and alterations

omitted), *abrogated in part on other grounds by Lewis v. Union City, Georgia*, 918 F.3d 1213, 1218 (11th Cir. 2019). "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of [a protected characteristic, such as race], constitute direct evidence of discrimination." *Van Voorhis v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (internal quotation marks and alterations omitted) (holding manager's statement he "didn't want to hire an old pilot" was direct evidence of age discrimination); *see also Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 855 (11th Cir. 2010) (noting Eleventh Circuit has held documents stating "Fire Early – he is too old" and 'Fire Rollins – she is too old" were direct evidence of age discrimination). Evidence that suggests, but does not prove, a discriminatory motive is circumstantial evidence. *Burrell v. Bd. of Trs. of Georgia Military Coll.*, 125 F.3d 1390, 1393-94 (11th Cir. 1997). Steele has not come forward with any direct evidence of race discrimination and instead relies on circumstantial evidence.

Courts in the Eleventh Circuit typically evaluate Title VII disparate treatment claims involving tangible employment actions that are based on circumstantial evidence using the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Burke-Fowler*, 447 F.3d at 1323. Under this framework, a plaintiff establishes a *prima facie* case of discrimination by showing (1) she is a member of a protected class, (2) she was subjected to an adverse

employment action, (3) her employer treated a similarly situated person outside her protected class (a "comparator") more favorably, and (4) she was qualified to do the job at issue. *Id.* The burden then shifts to the defendant to put forth a legitimate, non-discriminatory reason for the adverse employment action and then back to the plaintiff to show the proffered reason is pretext for discrimination. *Id.*

However, use of the *McDonnell Douglas* burden-shifting framework "is not the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "Rather, the plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* "A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted).

### A.    Failure to Establish *Prima Facie* Case

Here, it is the third element of Steele's *prima facie* case that is in dispute. A comparator must be similarly situated to a Title VII plaintiff in "all material respects." *Lewis*, 918 F.3d at 1218, 1224-29 (clarifying standard for comparator evidence in context of race discrimination case). As the word "material" indicates, "a valid comparison [] turn[s] not on formal labels, but rather on substantive

16

likenesses." *Lewis*, 918 F.3d at 1228.  Therefore, ordinarily, a valid comparator "ha[s] engaged in the same basic conduct (or misconduct) as the plaintiff"; "ha[s] been subject to the same employment policy, guideline, or rule as the plaintiff"; "ha[s] been under the jurisdiction of the same supervisor as the plaintiff"; and "share[s] the plaintiff's employment or disciplinary history."  *Id.* at 1227-28. Nonetheless, "what sort of similarity the in 'all material respects' standard entails [requires consideration] on a case-by-case basis, in the context of individual circumstances."  *Id.* at 1227.

As stated, Steele offers Hunter and Browning as comparators to support her *prima facie* case of race discrimination.  Steele argues she, Hunter, and Browning were subject to the same employment policy, were under the jurisdiction of the same supervisor (i.e., Snider), and engaged in the same basic misconduct and that despite these material similarities the BJCC terminated her while it "bent over backwards to help [Hunter and Browning] keep their jobs" and eventually permitted Browning to leave with a severance package.  Although these three individuals may have been subject to the same employment policy and under the jurisdiction of the same supervisor, the misconduct for which Steele was terminated is materially different from the misconduct for which remediation plans were developed for Hunter and Browning.

The undersigned addresses Browning first because she is the easier of the two to dismiss as a comparator. Browning's misconduct involved performance deficiencies typified by unavailability and unresponsiveness, as well as evidence she had come to work smelling of alcohol. This misconduct is not the same as the unprofessional management style for which Steele was terminated. *See Lewis*, 918 F.3d at 1227 (favorably citing Sixth Circuit case that held a plaintiff terminated for "misuse of an employer's property" could not rely on comparators allegedly guilty of "absenteeism" and "insubordination") (alteration adopted). It is the "apple" to Steele's "orange." *See Rioux v. City of Atlanta, Georgia*, 520 F.3d 1269, 1281 (11th Cir. 2008) (noting court should compare misconduct of Title VII plaintiff and comparator to avoid "confusing apples and oranges").

Hunter may be similarly situated to Steele in the sense aspects of her management style were unprofessional and created problems with some employees under her supervision, but this high-level abstraction is where the similarity of misconduct begins and ends. Hunter's unprofessional management style was attributed to her aggressive, straight-forward, abrasive personality. These temperamental traits are qualitatively different from the meanness and disrespect that characterized Steele's abusive management style. Not surprisingly, the qualitatively different temperamental traits had different effects on the managers' respective employees, both in terms of quality and quantity. Hunter's management

style, driven by her personality, made her difficult to work with, led one employee to resign from her position at the BJCC, and contributed to a conflict with another employee (Browning) requiring mediation by a third-party.  By contrast, Steele's management style, marked by meanness and disrespect, led one employee to characterize Steele as "the most evil person in the facility" and working under Steele's supervision as "HELL," and Steele's abuse and mistreatment, described in detail to Bell and Quinn, was so pervasive that half of Steele's subordinates were contemplating resignation.  Moreover, Quinn concluded that in addition to managing her employees in a mean and disrespectful way, Steele exhibited inappropriate favoritism toward certain employees, gossiped about employees' personal lives, made discriminatory comments about her White supervisors, and retaliated against employees who complained about her to her superiors.  These additional ways in which Steele fell short as a manager set her apart from Hunter.

Steele attempts to draw a parallel between the discriminatory comments she made about her White supervisors and the insubordinate conduct exhibited by Hunter.  To the extent Steele's comments are fairly characterized as insubordination, the insubordination is markedly different than that of Hunter.  Steele invoked race as a means of discouraging employees from complaining about her to her superiors. By contrast, Hunter's insubordination took the form of vocal, public opposition to Snider's decisions.

19

Steele also attempts to draw a parallel between her retaliatory conduct and Hunter's treatment of Witt, who reported Hunter "punished" her when she did not do things Hunter's way. This single allegation of retaliatory conduct made against Hunter, as to which there is no elaboration in the record, does not approximate the magnitude of the retaliatory conduct of which Steele was accused. To reiterate, multiple employees reported Steele retaliated against them for various perceived infractions and gave concrete examples of the retaliation, which included scheduling shifts in a manner designed to be punitive and harassing one employee for three hours by repeatedly calling him away from his work and stating she could not believe he "put the white folks on [her]." This retaliation created such a culture of fear in Steele's department that employees tearfully begged Bell and Quinn not to reveal to Steele what they had said about her.

Because Hunter's deficiencies as a manager were both qualitatively and quantitatively different than Steele's deficiencies as a manager, Hunter, like Browning, is not a proper comparator. *See Brown v. Jacobs Eng'g, Inc.*, 572 F. App'x 750, 752 (11th Cir. 2014) (holding proffered comparators were not similarly situated to plaintiff because even if, like plaintiff, they had difficult personalities or management styles, those attributes did not cause the problems associated with plaintiff's department). This is true even though Steele may have had more years of service with the BJCC than either Hunter or Browning and, at least until August

2016, a superior employment record. *See Lewis*, 918 F.3d at 1218, 1224-29 (requiring comparator to be similarly situated to Title VII plaintiff in "*all* material respects") (emphasis added). Without a proper comparator, Steele cannot make out a *prima facie* case of race discrimination under the *McDonnell Douglas* burden-shifting framework.

### B.      Legitimate, Non-Discriminatory Reason for Terminating Steele

Assuming for the sake of argument that Steele had established a *prima facie* case of race discrimination, the BJCC has articulated a legitimate, non-discriminatory reason for terminating Steele, and Steele has failed to show the reason is pretext for discrimination.

An employer's burden under the *McDonnell Douglas* framework is one of production, not persuasion. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005); *see also Meeks v. Computer Assocs. Intern.*, 15 F.3d 1013, 1019 (11th Cir. 1994) ("[T]he defendant must merely proffer [] reasons [not based on a protected characteristic], not prove them."). This burden is "exceedingly light." *Vessels*, 408 F.3d at 769-70 (internal quotation marks omitted). "So long as the employer articulates 'a clear and reasonably specific' non-discriminatory basis for its actions, it has discharged its burden of production." *Id.* at 770 (quoting *Burdine*, 450 U.S. at 254-55).

The BJCC asserts it terminated Steele based on Quinn's conclusion Steele's unprofessional management style had created a serious problem in the Building Services Department and its own determination that of the three remedial measures recommended by Quinn, termination was the only feasible option. This satisfies the BJCC's burden under the *McDonnell Douglas* framework. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010) (holding employer satisfied its burden under the *McDonnell Douglas* framework by producing evidence it terminated plaintiff for her management style, unprofessional conduct, poor interpersonal skills, and creation of hostile work environment).

### C.    Failure to Demonstrate Pretext

"The inquiry into pretext centers on the employer's beliefs, not the employee's . . . ." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Id.*; *see also Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("Federal courts 'do not sit as a super-personnel department that reexamines an entity's

22

business decisions.'") (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988)). Moreover, "[i]t is a well-settled principle of employment law that in investigating employee misconduct and reaching an employment decision, employers are entitled to make credibility decisions, and [a court's] inquiry is limited to whether the employer reasonably believed in good faith that the employee had engaged in misconduct, not whether the employee actually did so." *Leach v. State Farm Mut. Auto. Ins. Co.*, 431 F. App'x 771, 777 (11th Cir. 2011). In short, "[an] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984), *abrogated in part on other grounds by Lewis*, 918 F.3d at 1213, 1218, 1224-29. Thus, to meet her burden at the third step of the *McDonnell Douglas* framework, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies[,] or contradictions in [the employer's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (internal quotation marks omitted).

Steele argues the treatment Hunter and Browning received following Quinn's investigation demonstrates the BJCC's proffered reason for terminating her is pretext for discrimination, both because it was lenient when compared to the

discipline she received and because it was a deviation from the BJCC's employment policy.  Neither argument is availing.  "An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects' – *e.g.,* who engaged in different conduct, who were subject to different policies, or who have different work histories."  *Lewis*, 918 F.3d at 1228.  As discussed above, the misconduct in which Hunter and Browning engaged was materially different than the misconduct in which Steele engaged.  Therefore, the fact that Hunter and Browning received discipline short of termination for their misconduct – or even, per Steele's characterization of their treatment, no discipline at all – does not cast doubt on the BJCC's proffered reason for terminating Steele.  *See id.*; *Carter v. Columbia Cnty.*, 597 F. App'x 574, 580 (11th Cir. 2014) (holding that because White employee did not engage in same misconduct as plaintiff, who was Black, fact that White employee did not receive same discipline as plaintiff did not demonstrate pretext).

The inconsistent application of an employment policy may suggest pretext.  *See Berg v. Florida Dep't of Labor and Emp. Sec., Div. of Vocational Rehab.*, 163 F.3d 1251, 1255 (11th Cir. 1998) ("[I]nconsistent application of employment policies [may be] circumstantial evidence of discrimination."); *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1279 (11th Cir. 2002) ("The bending of established rules may, of course, be suggestive of discrimination.").  However,

24

Steele has failed to show the BJCC's employment policy was applied inconsistently. The policy sets forth a non-exhaustive list of misconduct that "may" subject an employee to immediate discharge, including the type of misconduct in which Steele engaged and, arguably, the type of misconduct in which Hunter and Browning engaged.  Use of the word "may" indicates the immediate discharge of an employee pursuant to the policy is permissive and discretionary, as opposed to mandatory.  *See Walker*, 286 F.3d at 1279 (rejecting assertion employer deviated from hiring policies by not posting job, made in service of argument employer's proffered reasons for not hiring plaintiffs were pretext for discrimination, where testimony established decision whether to post job was discretionary).  Moreover, the BJCC had good reason to exercise that discretion as to Steele but not Hunter or Browning.  Quinn determined neither Hunter nor Browning should be removed from her position, and the BJCC had options short of termination by which it could address the conflict between the two women.  By contrast, there was no option short of termination by which the BJCC effectively could resolve the employment issues created by Steele's unprofessional management style.

Throughout her response to the BJCC's motion for summary judgment, Steele references her decades of employment with the BJCC, "stellar" job performance in the years preceding her termination, and lack of disciplinary history.  These references may show Steele considers herself to have been a good employee overall,

25

but that is irrelevant to the pretext analysis.  *See Lindamood v. Florida Dept' of Bus. & Prof. Regul.,* 630 F. App'x 904, 907 (11th Cir. 2015) (holding the fact that a plaintiff considers herself to have been a good employee has no bearing on the pretext analysis in an age discrimination case because that analysis focuses on beliefs of employer, not employee).  The references may even show the BJCC considered Steele to have been a good employee until August 2016, but they do not suggest the BJCC did not terminate Steele in November 2016 after an independent investigation concluded her unprofessional management style had created a serious problem in the Building Services Department.

Finally, in arguing her *prima face* case, Steele refers to the anonymous August 15, 2016 e-mail that prompted the investigation into her management practices as a "hit job" containing "sensationalized allegations" that were "largely unsubstantiated" and asserts approximately half of the individuals interviewed by Quinn had no problem with her.  To the extent Steele attempts to demonstrate pretext by arguing the decision to terminate her employment was based on erroneous and/or insufficient information, the attempt falls flat.  The relevant question is not whether the allegations made against Steele were true but, rather, whether the BJCC believed them to be true and had a reasonable, good faith basis for holding such belief.  *See Alvarez,* 610 F.3d at 1266 (noting relevant question was not whether there were problems with plaintiff's job performance but, rather, whether plaintiff's employers

were dissatisfied with her for this or other non-discriminatory reason, even if mistakenly or unfairly so, or instead merely used performance problems as cover for discriminating against plaintiff because of her Cuban origin); *Leach* (discussed *supra*).   The BJCC has presented uncontroverted evidence it believed Steele's unprofessional management style to have made her continued employment untenable, and the independent investigation conducted by Quinn provides a reasonable, good faith basis for that belief.   The fact that some of the individuals interviewed by Quinn had no problem with Steele does not undermine that basis because at least half of them described Steele as a mean, disrespectful, and otherwise unprofessional manager, and the BJCC was entitled to choose which group of employees to believe.   *See Leach* (discussed *supra*).

Because the BJCC has articulated a legitimate, non-discriminatory reason for terminating Steele's employment, which Steele has failed to rebut, Steele could not carry her burden under the *McDonnell Douglas framework*, even if she had identified a valid comparator.[13]   Accordingly, Steele's race discrimination claims asserted through Title VII and § 1983 fail.

---

[13] Steele has also failed to present a "convincing mosaic" of circumstantial evidence that would permit the inference the BJCC intentionally discriminated against her.

## IV.   Conclusion

For the foregoing reasons, the BJCC's motion for summary judgment (Doc. 38) is due to be granted and this action is due to be dismissed with prejudice.  A separate order will be entered.

**DONE** this 11th day of March, 2021.

*Staci G. Cornelius*

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE